UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FHARMACY RECORDS a/k/a,
FHARMACY RECORDS PRODUCTION CO.,
FHARM I PUBLISHING COMPANY, SHELTON
RIVERS,

          Plaintiffs,

v.

                                            Case Number 05-72126
                                            Honorable David M. Lawson

SALAAM NASSAR,CURTIS JACKSON,
DARRIN DEAN, DEF JAM RECORDING,
RUFF RYDERS, JANICE COMBS PUBLISHING,
UNIVERSAL MUSIC PUBLISHING, UNIVERSAL
MUSIC & VIDEO DISTRIBUTION CORPORATION,
EMI APRIL, INC., SOO SOOS SWEET SWISHER
MUSIC, JOHN DOE, ET AL.,

          Defendants.

_____ /

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, GRANTING DEFENDANTS' MOTION TO DISMISS, DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT, AND ADJUDICATING OTHER PENDING MOTIONS

This is a copyright infringement action in which plaintiff Shelton Rivers claims to be the original author of a rhythm line – or "beat" – that was duplicated – that is, "sampled" – by defendant Salaam Nassar and incorporated into a rap tune, which enjoyed commercial success. Both Rivers and Nassar claim to be the original creator of the beat. However, the plaintiff's sole remaining theory of liability is based on a claim of unlawful sampling under 17 U.S.C. § 114(b), which has not been established by the evidence before the Court regardless of which of the two is the original author. The parties have filed several motions, some of which raise disturbing allegations of misconduct by the plaintiffs and their attorney, Gregory Reed, Esq. The Court finds that the cross motions for summary judgment must be decided in favor of the defendants because the plaintiffs have not come forward with evidence that establishes that the accused work, a rap tune called "Shot

Down," contains a direct or indirect "recapture [of] the actual sounds fixed in the recording" Rivers said he made or a rearrangement of "the actual sounds fixed in [Rivers's] sound recording." *Ibid.* The Court also finds that the plaintiffs or their representatives have altered, lost, and destroyed evidence in the case, which warrants dismissal under this Court's inherent authority to address such abuses. The Court, therefore, will grant the defendants' motion for summary judgment, grant the defendants' motion for sanctions, and deny the plaintiffs' motion for summary judgment. The Court also will deny the defendants' motion to exclude the plaintiffs' witness as moot, and the deny the plaintiffs' reciprocal motion directed at the defendants' expert, and deny other pending motions.

## I. Facts and Proceedings

The parties' claims involve the testimony of a number of witnesses, affidavits, and several items of physical evidence. Therefore, a detailed recitation of the facts is required to address the issues that are necessary to the Court's decision.

### A. Background

The plaintiffs are Fharmacy Records, Fharm I Publishing Company, and Shelton Rivers. The remaining defendants are Salaam Nassar, Curtis Jackson (a.k.a. 50 Cent), Darrin Dean (a.k.a. Dee), Def Jam Recording, Ruff Ryders, Justin Combs Publishing, Universal Music Publishing, Universal Music and Video Distribution Corporation, EMI April, Inc., Soo Soo Sweet Swisher Music, and John Doe agents and attorneys. Several other defendants have been terminated from the litigation. The plaintiffs allege that the defendants sampled portions of the plaintiffs' copyrighted instrumental rhythm line, "ESS Beats," without authorization to create a rap song entitled "Shot Down," which was recorded by the rap artist DMX. The plaintiffs claim the defendants distributed and sold the

infringing material throughout the United States and Europe, reaping substantial profits, as they sold over three million infringing albums.

Although the plaintiffs commenced this litigation on May 31, 2005, the case finds its origins in the release of DMX's fifth rap album in 2003 entitled *Grand Champ*. DMX's album featured the song "Shot Down" as the seventh cut. Although the track attracted some attention due to a cameo appearance by hip-hop icon 50 Cent, it was otherwise unremarkable. Nevertheless, like DMX's previous releases, *Grand Champ* went platinum. *See Grand Champ at* http://en.wikipedia.org /wiki/Grand_Champ (last visited March 31, 2008).

Although mediocre at best, the beat in "Shot Down" nonetheless forms the heart of the present controversy. The dispute is simple: while defendant Salaam Nassar claims that he created the beat, plaintiff Shelton Rivers claims that he engineered the beat two to three years beforehand, and the defendants simply copied it, thereby infringing the sound recording. The other plaintiffs in this case, Fharmacy Records Production Co. (a/k/a Fharmacy Records) and Fharm I Publishing Co., are related entities that allegedly acquired ownership of "ESS Beats" following assignments in 2001 and 2004.

Rivers is a composer and performer known as "Essman" or "Ess." According to Rivers, he composed the beat at issue, which he called "Ess Beats," in 2000 or 2001. Despite that claim, however, the plaintiffs did not file an application for registration of the beat with the United States Copyright Office until 2004. The application was granted on May 5, 2005.

In their complaint, the plaintiffs initially asserted counts for copyright infringement in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*; unfair competition in violation of California Civil Code § 3369 and California Business and Professional Code § 17500; and intentional

interference with contractual relationships.  *See* Compl. [dkt # 1] at ¶¶ 21-37, 38-39, 40-48. Pursuant to an order entered in January 2006 by Judge Victoria Roberts, however, the state-law counts were dismissed as preempted by the Copyright Act.  In addition, Judge Roberts ordered the plaintiffs to reimburse the defendants under 28 U.S.C. § 1927 for their costs and fees incurred in bringing the motion for partial dismissal.  Judge Roberts observed that the plaintiffs had no basis for asserting the state-law counts and they had tried to defend such action by advancing a frivolous argument.

## B.  Initial Phase of Discovery

The parties first focused on proof that might substantiate the competing claims of Rivers and Nassar as to which one was the original composer of ESS Beats.  The discovery proceedings were quite contentious.

### 1.  Written discovery

In their April 17, 2006 responses to the defendants' interrogatories, the plaintiffs stated that "ESS Beats was created by Shelton Rivers in 2001."  Defs.' Mot. for Sanctions, Ex. 2, First Set of Interrogatories at 4.  The plaintiffs further stated their belief that Salaam Nassar obtained access to "ESS Beats" by way of Rivers and Nassar's mutual connection to the rap group D12, for whom Nassar functioned as a disc jockey (DJ).  The plaintiffs said D-12 took Rivers "under [its] wing" in 2001, and he made music at its studio that year.  *Id.* at 5.  While doing so, Rivers distributed "numerous copies" of a compact disc (CD) with "ESS Beats" on it to D-12 and its affiliates, including manager Mark Hicks and producer Denaun Porter.  Nassar supposedly then obtained a copy from either Hicks or Porter.  When asked for specific details of Rivers's involvement in the creation of "ESS Beats," however, the plaintiffs were evasive.  They refused to state when Rivers

created the beat and what steps he took in doing so. Nevertheless, the plaintiffs did indicate that in addition to Hicks and Porter, R.J. Rice and Jared Gusselin had knowledge of the creation of "ESS Beats." Rice, as the plaintiffs would later reveal, is the owner of R.J. Rice Studios in Southfield where Rivers supposedly played "ESS Beats" for an interested rap group, Slum Village. Defs.' Mot. for Sanctions, Ex. 10, Rice Aff. Gusselin was a sound engineer at Rap Game Studios where Rivers did some work, although it is unclear whether "ESS Beats" ever made an appearance there. *See* Defs.' Mot. for Sanctions, Ex. 6, Rivers Dep. at 84-86.

The plaintiffs also responded to the defendants' first set of document requests on April 17, 2006. In response to the defendants' request for "the original recording of 'ESS Beats' in the original medium in which it was recorded," the plaintiffs responded that the "master recording" was available for inspection at counsel's office. Defs.' Mot. for Sanctions, Ex. 2, First Set of Doc. Requests at 3-4. The defendants also requested all "documents evidencing the creation of 'ESS Beats.'" *Id.* at 5. The plaintiffs answered that they were in the process of searching for such materials and would produce them when found. The defendants further requested all documents evidencing the nature of the relationship between the plaintiffs, but the plaintiffs objected to this request for vagueness and overbreadth.

In the end, the plaintiffs only produced two items in response to the defendants' document requests. These were two documents concerning the assignment of "ESS Beats" from Rivers to the Fharmacy entities. The first, dated May 18, 2001, is entitled "Transfer of ESS Beats Assignment," and reads as follows:

> For the value received, **SHELTON RIVERS**, the undersigned writer, creator, and composer of the music and beats of the song titled Ess Beats, developed and created on January 7, 2001, transfers and assigns his rights and interests in Ess Beats to **FHARMACY RECORDS**, which can be transferred to any entity affiliated with

> entities herein that are known as **Fharmacy Records, Fharmacy Records Production Co.,** and **Fharm I Publishing Co.** or any entity or venture elected by the entities. The composer authorizes the assignee to secure any valid copyright registration of the music and beats.

Defs.' Mot. for Sanctions, Ex. 4, 2001 Assignment Doc. This 2001 assignment document raised suspicion because Jeffrey Seaton, co-owner of the Fharmacy entities, testified that Fharmacy Records Production Co. and Fharm I Publishing Co. were not created until 2004. Defs.' Mot. for Sanctions, Ex. 8, Seaton Dep. at 8, 27-30. Seaton stated that he created this document on his mother's computer, and he said that he gave the original of both this and the second assignment document to his attorney, Gregory Reed.

The second assignment document, styled "Co-Owners Ess Beats Assignment," is dated April 2, 2004. It reads:

> For the value received, the undersigned, **JEFFREY SEATON**, individually and on behalf of **WILLIAM ALLEN**, as the corporate officers of Fharmacy Records ("Claimants") transfers, assigns and sells his rights and interests, individually and on behalf of **WILLIAM ALLEN** in the song titled Ess Beats, created by Shelton Rivers on January 7, 2001, to **Fharmacy Records, Fharmacy Records Production Co.,** and **Fharm I Publishing Co.**

Defs.' Mot. for Sanctions, Ex. 4, 2004 Assignment Doc.

The plaintiffs also produced a CD with "ESS Beats" and "Shot Down" on it, but they had done that earlier in March 2006, following a Rule 16 conference.

### 2. Depositions

With this discovery in hand, the defendants proceeded to depose Shelton Rivers, Jeffrey Seaton, and William Allen.

a. Shelton Rivers's deposition

Rivers testified that he first met Seaton and Allen in 2000 while making beats at Rap Game Studios in Birmingham, Michigan. They listened to his beats and liked what they heard, so they asked him if they could use his work. Rivers agreed, and he provided music for an artist known as M.C. Breed. Sometime later, Rivers says that he created "ESS Beats."

Rivers testified that he created "ESS Beats" in 2000 or 2001, but he does not know the exact day. Defs.' Mot. for Sanctions, Ex. 6, Rivers Dep. at 33. According to Rivers, he made the beat at 1050 Lafayette Street in Detroit, where he was living at the time with his fiancé. He made the beat using a synthetic drum machine called an MPC 2000 and a keyboard, and it took him only fifteen minutes. Upon completion, Rivers saved the beat, which was in digital electronic format, to a zip disk and also recorded it onto a CD. The MPC 2000 apparently lacks internal electronic storage capability, so to preserve the beat it is necessary either to save it to an external zip disk, "dump" the beat into a "board" (using "Pro Tools" software) by way of a MIDI, or burn it onto CD. Rivers explained that if the "dumping" method is chosen, all eight "leads" or "tracks" (i.e., sound loops) are transferred into the board intact. If the CD method is chosen, the beat is collapsed into only two tracks, resulting in an inferior product. Rivers made a dozen or so copies of the "ESS Beats" CD and gave them to Mark Hicks, his manager at the time. He also gave a copy to Allen and Seaton. Hicks apparently distributed the CDs widely, because Rivers stated that "[t]he whole hip hop community heard that beat." *Id.* at 34. Rivers stated that among others, D12 and its various members (including Nassar) heard the beat, since Hicks was D12's manager and Rivers worked with Nassar from time to time. Nothing immediately came of "ESS Beats," however, and Rivers parted ways with Hicks sometime in 2001.

At the time of his desposition, Rivers stated that he still had the zip disk containing the original "ESS Beats" file that he saved upon creation. *Id.* at 71-72, 101.

In addition to Hicks's attempts, Rivers says he made his own efforts to interest artists in "ESS beats." In 2001 or 2002, Rivers met with rap group Slum Village at R.J. Rice Studios in Southfield. *Id.* at 40-42. Rivers brought his MPC 2000 to the studio, hooked up all eight leads, and "put into their system three beats, one of which was Ess Beats." *Id.* at 42. Slum Village ended up using one of the beats other than "ESS Beats." The only other time Rivers made the beat available in its original, eight-lead format was "sometime between 2001 and 2003" at Fharmacy Records studio in Ypsilanti. *Id.* at 43. He did this because he was "comfortable" with Seaton and Allen, and he transferred the beat through a MIDI onto the computer program "Pro Tools." *Id.* at 44-45. Rivers did not have a specific project in mind, but gave them the beat for "whatever they wanted to do with [it]." *Id.* at 45.

Rivers later met "Sticky Fingers," a hip hop producer, artist, and manager, in Los Angeles. Sticky Fingers became Rivers's manager, and Rivers moved to Los Angeles to work with Sticky, where he apparently remains to this day. *Id.* at 38. While sitting in a car in Los Angeles, one of Rivers's friends told him that Rivers's "boy," Salaam Nassar, had "landed" a beat on DMX's new album, *Grand Champ*. *Id.* at 49-50. Rivers said that he was intially happy for Nassar, and Rivers asked his friend to play the DMX song. "Shot Down" was played, and Rivers insists that he immediately recognized the instrumental as "ESS Beats." Rivers states that he was "hurt," but he says that he could not take any action right away because he had to travel to Africa to work on a project with Sticky Fingers.

When he returned from Africa around Christmas 2003, Rivers started talking with people from D-12 and eventually made contact with Nassar over the phone. They spoke a number of times, but "th[e] last conversation wasn't very good." *Id.* at 54. According to Rivers, Nassar told him that he had earned $7,500, and he offered to split that sum with Rivers. Rivers refused, and the conversation devolved into "cussing and hollering." *Id.* at 55. At some point, Rivers acknowledged that he "actually taped some of the conversation because he admitted so many times that he took the beat." *Ibid.* Rivers stated that he still had the tape in Los Angeles but said it was "not significant" because his "tape recorder [may have] messed up at the time," and there was so much yelling. *Id.* at 55-56; *see also id.* at 61-62. Nevertheless, plaintiffs' counsel, Gregory Reed, stated that he would acquire and distribute a copy of the tape. *Id.* at 123. During at least one of their conversations (it is unclear whether it was the recorded one), Nassar tried to say that he made the beat and, later, that they made the beat together. That apparently agitated Rivers, because Nassar was "lying all the way around," he says. *Id.* at 62. Additional proof of this proposition came from an interesting source, a rapper named "Proof." Proof, who was famously slain outside a Detroit nightclub in 2006, was part of D12 and had heard "ESS Beats." When Rivers returned from Africa, he says Proof called him and said it was terrible that Nassar had stolen the beat. *See id.* at 53 ("Proof's like, yo man, what Salaam did was messed up, that was terrible.").

When asked how Nassar could have obtained access to the beat, Rivers explained that there were a number of possibilities:

> [W]hen I first heard ["Shot Down"], I thought he took it off the two track or the CD and he just, you know, manipulated some type or played it over. But actually we worked at his house – I worked at his house like I told you about. He could have took it off my zip [disc], you know what I'm saying, while I left for anything, went to the store or something, and we were working at Rap Game Studios. I brung him and Proof [from D12] and a lot of those guys around over there, you know, and, you

-9-

know, my zips like even Denaun Porter from D12 ended up with one of my zips one time. You know what I'm saying? And they – they run in cahoots and mess around. So, yeah, I was looking for every which – every way like.

*Id.* at 64-65. Rivers later clarified that he indeed brought a zip disc with "ESS Beats" on it to Nasssar's home when we worked with Nassar on one occasion.

When questioned whether there are any differences between "ESS beats" and the beat on "Shot Down," Rivers gave answers that can be considered contradictory:

> Q. . . . . Based on your experience in the music industry do you believe that there are any differences at all between your beat and the beat used on the DMX song?
>
> A. Any differences? No. I can't say – actually, I think mine sounds better coming off the MP[C 2000] than what he did with it, you know. But honestly it's the same. It's the same beat. They're ain't no difference.
> . . .
>
> Q. So there's some minor, what would you call them, textual differences or textual? How would you characterize –
>
> A. When you drop a beat, producers mix – everybody has different ears. People mix different. But actually he didn't really mix it too good, you know what I mean? He didn't mix it. It's the same beat.

*Id.* at 67-68.

Rivers testified that he thinks he owned the beat when "Shot Down" was released, but he acknowledged that Seaton and Allen may have had some interest in it at the time. *Id.* at 57-58. At another point, however, Rivers testified that Allen, Seaton, and the Fharmacy entities did not acquire the rights to "ESS Beats" until 2004. *Id.* at 87-88. He doubled-back once more, however, acknowledging that he signed the 2001 assignment agreement. *Id.* at 93, 96-97. Nevertheless, Rivers apparently thought this was not a full assignment, but simply a way for him to "share" his beats with Fharmacy. *See id.* at 96-97. Rivers thinks that he talked with Seaton and Allen the day after he first heard "Shot Down," and they expressed frustration and shock at Nassar's theft. Seaton

-10-

and Allen told Rivers that they would help him take legal action, and they paired Rivers up with attorney Gregory Reed.

According to Rivers, Seaton approached him in 2004 and told him they were going to file an application for registration with the Copyright Office. Even though Rivers saw the application before it was filed in June 2004, it was filed with an error as to Rivers's birth-date (the year was listed as 1976 instead of 1973). Rivers said he actually thought a copyright application had been filed in 2001, but he realized this was not the case when the 2004 application was filed.

### b. William Allen's deposition

William Allen, co-owner of the Fharmacy entities, confirmed that Rivers downloaded "ESS Beats" from his MPC to Fharmacy's studio computer sometime in late 2000 or early 2001. He says that in addition to Rivers, Allen and Seaton were present at the studio. "ESS Beats" was transferred to Fharmacy's Macintosh G4, which Allen says he still possesses. Allen could not say whether the "ESS Beats" file was still on the computer, although he had no reason to believe that it was not.

### c. Jeffrey Seaton's deposition

Seaton testified somewhat differently. He stated that "ESS Beats" found its way onto the Fharmacy computer by way of a CD that Rivers had burned from his MPC. The CD files were transferred to the computer and loaded to the program "I Tunes." To the best of Seaton's knowledge, therefore, he has "no Pro Tools files with recordings of Ess Beats . . . either on [his] computer or on a backup disk." Defs.' Mot. for Sanctions, Ex. 8, Seaton Dep. at 97.

Rivers's testimony on the point may reconcile that of Seaton and Allen. According to Rivers, he transferred to Fharmacy the eight-track version from his MPC, and also "dumped the two track" version. Rivers Dep. at 43. Based on his earlier testimony – that an MPC-to-CD transfer

results in a two-track song – it would appear that Rivers's reference to "the two track" signified a CD.

Seaton also testified that he gave the original CD containing "ESS Beats" (which he received from Rivers in 2001) to Mr. Reed. Seaton emphasized that this disk was important to establishing the prior creation of "ESS Beats":

> Q.    Okay.  Other than Mr. Rivers telling you that he created Ess Beats in approximately January of 2001, have you seen or are you aware of any evidence that substantiates or supports this claim.
> A.    Yes.
> Q.    What evidence?
> A.    I also have a beat.
> Q.    Okay.  How did you get it?
> A.    Through Mr. Rivers.
> Q.    And approximately when did you receive that?
> A.    2001.
>        . . .
> Q.    What's on this disk?
> A.    Beats.  Ess beat.
>
>        . . .
> Q.    So Ess Beats is one of many on this disk?
> A.    Correct.
>        . . .
> Q.    And you still have this disk?
> A.    Yes.  I gave it to Mr. Reed.

Seaton Dep. at 53.  When defense counsel asked Mr. Reed if he had that disk with him, he stated that he thought he did, but a search revealed that he did not.  *Id.* at 58.  Reed promised to produce the CD allegedly given him by Seaton (in addition to the tape recording and zip disk), assuming he could find it.  *Id.* at 83-84.

### d. Salaam Nassar's deposition

The plaintiffs' counsel deposed Salaam Nassar on August 31, 2006. At that time, Nassar was still acting as a DJ for D12, and he was also working with Obie Trice, another Detroit rap artist of national fame. Nassar stated that he did not know Seaton, but he met Allen once when Allen came to pick Rivers up from Nassar's home. Although he cannot recall the number of times, Nassar stated that Rivers has been to his home on multiple occasions and sometimes spent the night. When Rivers went to Nassar's home, the two would "hang out" and work on music. Defs.' Mot. for Summ. J, Ex. 34, Nassar Dep.; Pls.' Mot. for Summ. J., Ex. P, Nassar Dep. at 14-16. Nassar met Rivers through Denaun Porter, one of the members of D12, in 2000 or 2001. Nassar admitted that the two "reviewed" each other's music, but he described it as an informal arrangement. Nassar said that Rivers would sometimes play his music while he, Nassar, was doing other things. Nassar stated that he too made his music with a drum machine (an MPC 2000), and he described the process similarly. He would create the beat on a drum machine and then either burn it to CD or load it onto a computer. In the latter scenario, he would use software that would separate all the different instrument tracks, and from there he could make changes as desired.

Turning to the creation of the beat in "Shot Down," Nassar testified as follows:

Q. Based upon the subject of why we are here today, did you work with anyone with that creation of "Shot Down"?
A. No.
Q. And where was that created?
A. At my house.
Q. What was that recorded on?
A. It was made with an MPC.
Q. And what year did you make that?
A. I want to say between 2000, 2001.

*Id.* at 28.  According to Nassar, he was indeed "the original creator" of the beat at issue.  After making the beat, Nassar says he burned it to a CD, but he did not save it to a computer.  He did not bother getting the work copyrighted; however, once it was used by a major artist, "they had copywritten it so [he] had no need to copyright it."  *Id.* at 30.  Once he landed the spot on DMX's album in either 2002 or 2003, Nassar said he saved his beat to computer using ProTools software.  He then sent the ProTools file (saved on CD) to either the studio DMX was using or to Def Jam, the record label, and they went forward with it.  Nassar was ultimately paid $7,500 for his work, and he has not received any royalties.

Nassar says that he first learned about the present dispute when papers were served at his parents' house notifying him of the action.  He was "upset," and he considered suing Rivers for "falsifying" but decided against this.  *Id.* at 33-34.

Nassar testified that Rivers never gave any beats to him, but he recalled that Rivers had used his drum machine to play beats before.  As to the conversation that he had with Rivers after the release of "Shot Down," Nassar confirmed that they argued; however, he denied that he ever admitted stealing the song.  Nassar thought it was "silly" because it was his creation.  On the other hand, Nassar stated that he "might have" offered Rivers a small amount of money "to calm him down," but he could not recall for certain.  *Id.* at 48-49.  In relevant part, the deposition reads:

> Q.  Did you ever – just to calm him down, did you ever offer him any money?
> A.  No, not that I know of.  I don't know about offering money.
> Q.  Or a payment?
> A.  I might've.  I tried to just like talk like to confirm I wanted to meet him, just to confirm.  Because I had already – people had already come and, like, gossiped saying that he was going around saying that.
> Q.  Just to calm him down, did you offer him a thousand dollars?
> A.  I can't recall.
> Q.  Would you be willing to pay him any money today?
> A.  No.

Q. Just to get rid of this?

A. No.

Q. Is there any particular reason?

A. He – for what?  Why should I pay him money?  He didn't do nothing.  It's my song.  I did the music.

*Id.* at 48-49.  When questioned whether there was anyone who could confirm when he made the song, Nassar identified Tonytta Martinez.  Martinez owned the studio that Nassar "laid the music in."  *Id.* at 50.  Nassar said he used Martinez's studio around 2000, and he knows that he played the beat for him.  Nassar apparently used Martinez's ProTools software, as Nassar did not own the program himself.  However, although Nassar played the beat for Martinez in 2000 or so, he did not transfer it to ProTools until 2003.  According to Nassar, there was no need to transfer it to ProTools until DMX used the beat in 2003.

Nassar thinks that Rivers took the beat from him.  He thinks this would have been fairly easy for Rivers to do because Nassar and Rivers spent time together and Rivers had access to his equipment.

### C.  Discovery relating to the physical evidence

Based on the deposition testimony of Rivers, Allen, and Seaton, it would appear that there was one CD (given by Rivers to Seaton and Allen), a zip disk (containing the original "ESS Beats" file), and possibly files from Fharmacy's computer and R.J. Rice Studios, all of which had not been disclosed in response to the defendants' discovery requests.  As of August 2006, Mr. Reed had promised to produce the CD, the zip disk, the tape recording, and the original assignment documents,  but these promises largely went unfulfilled.

1. Efforts to compel production

Following several motions to compel discovery that were ultimately withdrawn, the present action was reassigned to the undersigned on October 3, 2006. That same day, Mr. Reed sent defense counsel a letter representing that he had been in contact with R.J. Rice of R.J. Rice Studios and that contact provided "irrefutable evidence" of Rivers's prior creation of "ESS Beats." Defs.' Mot. for Sanctions, Ex. 9, Oct. 3, 2006 Reed Letter at 1. Mr. Reed wrote:

> We presently have irrefutable evidence of the date that our client Mr. Shelton Rivers created the musical composition, "ESS Beats." Mr. R.J. Rice, the owner of R.J. Rice Studios, has provided our office with a dated archived computer disc and a signed declaration indicating that he was present when Mr. Rivers was creating and working on the musical composition during 2000 and 2001. The archived disc confirms that "ESS Beats" was transferred to a computer disc file during 2001, which is date stamped October 2001. Mr. Rice's declaration and a copy of the computer disc are enclosed. Also, enclosed is a copy of Ms. O'Reilly's declaration confirming the creation date during 2000. There are seven (7) pieces of irrefutable evidence that support Plaintiffs' claims. [1] computer disc; 2) filed copyright; 3) R.J. Rice's declaration; 4) Emily O'Reiley's declaration; 5) Shelton Rivers' deposition; 6) William Allen's deposition; and 7) Jeff Seaton's deposition]

*Ibid.* As represented, Rice's declaration supported the plaintiffs' theory. According to Rice, he "was present when Shelton Rivers was working on and creating the musical sound beats known as 'ESS Beats,' during the latter part of 2000 and the beginning of 2001 . . . at R.J. Rice Studio." Defs.' Mot. for Sanctions, Ex. 10, Rice Decl. at ¶ 1. According to defense counsel, however, the enclosed disc "simply has a copy of 'Ess Beats' on it, but no other relevant data, and certainly nothing 'dated' as claimed by Plaintiffs." Defs.' Mot. for Sanctions at 7 n.2. As for Emily O'Reiley, although it is unclear exactly who she is, she stated in her declaration that she was present when Rivers was working on "ESS Beats" at R.J. Rice Studios. Defs.' Oct. 30 Mot to Compel [dkt # 127], Ex. 34, O'Reiley Decl.

After receiving this letter and corresponding information, the defendants filed another motion to compel discovery on October 30, 2006. At that point, discovery was closed under the terms of Judge Roberts's scheduling order, so the defendants sought to re-open discovery and compel the production of (1) the original CD that Seaton testified he received from Rivers and gave to Mr. Reed; (2) Rivers's zip disk; (3) the original assignment documents; and (4) the Rivers-Nassar tape recording. The defendants also requested an opportunity to test and inspect (a) the Fharmacy computer to which Allen stated "ESS Beats" had been downloaded, and (b) the computer belonging to Seaton's mother that Seaton said he used to create the 2001 assignment document. Among other things, the defendants alleged that plaintiffs' counsel had thwarted their attempts to inspect the Fharmacy computers. After four separate e-mail requests, Mr. Reed finally responded on September 7, 2006. He said that the equipment did not "presently . . . exist," but Seaton was "seeking to find out what happened." Defs.' Oct. 30, Mot. to Compel, Ex. 13. The defendants also observed that Mr. Reed had failed to produce the original CD allegedly given to him by Seaton, despite Reed's months-old promise to do so. The defendants reported the same road-block vis-à-vis the zip disk. Finally, with respect to the tape-recorded phone conversation, the defendants stated that they never received the tape and had not heard from Mr. Reed about it since August 2006.

On November 29, 2006, Magistrate Judge Donald Scheer granted in part the plaintiffs' motion to compel. Although his order did not discuss the rationale it length, it is clear that Judge Scheer believed the defendants to be in the right. He granted virtually all of the relief sought, including (1) expedited production of the Fharmacy Macintosh G4 for analysis and testing, (2) expedited production of Rivers's zip disk, (3) submission of a sworn declaration by Mr. Reed stating why he no longer had the original CD that was given him by Seaton, (4) submission of a sworn

declaration by Seaton stating that neither he nor his mother had possession of the computer that was used to draft the 2001 assignment document (a representation to that effect was apparently made at the hearing, and shortly beforehand), (5) expedited production of the original assignment agreements, (6) an opportunity to depose R.J. Rice, and (7) an opportunity to subpoena Rice in order to analyze his studio equipment and computers. MJ Order Granting Mot. to Compel [dkt # 139] at 1-3. Despite this order, compliance on the part of the plaintiffs and their counsel was marginal at best. Shortly after Judge Scheer granted the motion to compel, this Court issued a new scheduling order on December 11, 2006, extending discovery to late March 2007 and establishing a new dispositive motion deadline.

2. Evidence of tampering and spoliation of the physical evidence

a. The CD

With respect to the original CD, Mr. Reed had a declaration ready to give to defense counsel at the hearing on the motion to compel. Strictly speaking, therefore, he complied with that part of Judge Scheer's order. In terms of content, however, Reed's declaration raaises additional questions. Reed stated:

1.    During the 2001 calendar year, Jeffrey Seaton presented me with a CD that he received from Shelton Rivers containing multiple tracks with beats, which included "Ess Beats."

2.    I listened to the disc in 2001 containing "Ess Beats" and later compared it to the "Shot Down" recording by DMX on the Grand Champ album. The instrumental music from "Ess Beats" was identical to the instrumental music in "Shot Down."

3.    To date, I have been unable to locate the CD that Jeffrey Seaton presented to the undersigned that had multiple tracks containing "Ess Beats."

Defs.' Mot. for Sanctions, Ex. 15, Reed Dec. (dated Nov. 19, 2006). There is a major problem with this testimony (apart from the fact that Reed admitted losing key evidence). Although it bolsters the plaintiffs' theory of prior creation if Seaton gave Reed the disk in 2001, Seaton testified that he had *absolutely no dealings with Reed before 2003*. Defs.' Mot. for Sanctions, Ex. 8, Seaton Dep. at 53 ("Q. Had you had prior dealings with Mr. Reed? A. Before 2003? No."). And this of course is logical because there was no need to seek counsel until Rivers, Seaton, and Allen had heard "Shot Down," released *in 2003*. Allen and Rivers also testified that they had no dealings with Reed in 2003. Allen stated that his first dealings with Reed were in either 2003 or 2002 in connection with a contract issue for an unrelated artist. Defs.' Mot. for Sanctions, Ex. 7, Allen Dep. at 15. Rivers testified that he did not retain Reed until 2004 or 2005. *See* Defs.' Mot. for Sanctions, Ex. 6, Rivers Dep. at 58 (stating that he switched to Reed from another NY-based attorney because Reed appeared to have a better sense of his interests). Further undermining Reed's declaration is the fact that his office did not file an application for copyright registration until 2004.

### b. The zip disc

Turning to the zip disk, the plaintiffs did produce this item, but it was not what it was represented to be. The defendants hired Ives R. Portrafka, a senior examiner with the Center for Computer Forensics, to forensically analyze the zip disk and other electronic data in this case, and his findings were disturbing. Potrafka acquired the zip disk from Mr. Reed's office on December 14, 2006. He found that although it was labeled "Ess-Beat/D.W.," the zip disk contained "no data" whatsoever. Thinking this odd, Potrafka conferred with technical support from Iomega, the disk's manufacturer. Technical support confirmed that Iomega "does not ship disks void of data" but

rather formats and "places Iomega data on its Zip Disks." Defs.' Mot. for Sanctions, Ex. 18,

Potrafka Report at 2. Potrafka therefore concluded that

> ● This Zip Disk was "wiped clean" using some type of wiping utility. A view of the disk in Hex show[s] that every bit on the Zip Disk was "00." If the data on the Zip Disk had been deleted or had the Zip Disk been formatted, the disk would not have been totally blank. The wiping of the Zip Disk is an intentional act by a user to destroy all data on the Zip Disk.

> ● Iomega Technical Support stated that they have NEVER shipped an Iomega Zip Disk without Iomega data contained on the disk, thus making a totally blank disk impossible without user interaction to wipe the disk.

*Id.* at 6. The plaintiffs have offered no evidence to rebut Potrafka's conclusion regarding the zip

disk. The only argument they advance with respect to this point is contained in the following two

sentences: "Defendants' assertion that the original zip disk was intentional erased [sic], is without

factual foundation and is ludicrous. If in fact the original zip disk was erased it was not erased by

Plaintiffs: there would be no point in submitting a zip disk under these circumstances." Pls.' Resp.

to Mot. for Sanctions at 9.

### c. The Fharmacy computer

Potrafka's analysis of the Fharmacy computer, once it was finally made available, is equally

troubling. As noted above, Allen testified that Rivers downloaded "ESS Beats" from his MPC 2000

to Fharmacy's studio computer (a Macintosh G4) sometime in late 2000 or early 2001. Defs.' Mot.

for Sanctions, Ex. 7, Allen Dep. at 36. Allen stated that Fharmacy still had that computer, but he

was not certain whether "ESS Beats" was still on it. *Id.* at 37-39. Based on Potrafka's rather

extensive review, this testimony cannot be accurate because the Fharmacy Macintosh *did not even

exist until 2003*. Potrafka acquired the Macintosh from Reed's office and analyzed its two internal

hard drives. *See* Potrakfa Report at 1. Before turning to the hard drives, he attempted to determine

the manufacture date of the computer by speaking with Apple technical support. The computer bore serial number XB304ZXHN1W, and tech support informed Potrafka that the third character of the serial number represents the year of manufacture and the fourth and fifth characters represent the week of manufacture. *Id.* at 3. Hence, the Fharmacy computer was made in the fourth week of 2003. With respect to the first hard drive, made by Western Digital, Potrafka observed a "[m]anufacture date of '18 Feb 2005' stamped on the label." *Ibid.* Potrafka found no manufacture date on the second hard drive and was unable to obtain any records from Seagate, its manufacturer. Analyzing the files on the hard drives that were supposedly related to "ESS Beats," Potrafka found that although those files bore creation dates consistent with the plaintiffs' theory, they had been intentionally backdated, evidently by the plaintiffs' computer "expert," Bernard Terry. Accordingly, Potrafka concluded:

1. It is the opinion of this computer expert that the Fharmacy computer could not have been in operation any earlier than 2003. This conclusion is based on the following facts:

- The computer was manufactured 4th week of January 2003
- The hard drive (Item #1a) containing the "new cuts" and "shelton_rotweiler" files was manufactured on "18 Feb 2005"
- "bernard terry" user file was created May 31, 2005
- A review of all .AIF music files for all three volumes shows the majority of creation dates after March 21, 2003. Of the files with creation dates before March 21, 2003, 10 have creation dates in 2001 ("new cuts"). In addition, 1771 files have either 1970 dates or the Macintosh default date of January 1, 1904 as creation dates.

2. It is the opinion of this computer forensic examiner that the "new cuts" and "shelton_rotweiler" files were written to the Fharmacy computer, Item #1a, volume OSX START UP 2, between September 19, 2006 and September 28, 2006 based on the following facts:

- The folder containing the "shetlon_rotweiler" file was created on September 28, 2006

- The folder containing the ".aif" sound files was created on September 19, 2006.
- The FileID's are in the number range for September of 2006
- A review of the Fharmacy computer for the keywords, "shelton", "rivers", or "ESS" revealed no files, created before 2003, other than "shelton_rotweiler" identified above.

*Id.* at 5-6. If Potrafka's conclusion – that the files were actually written to the Fharmacy computer between September 19, 2006 and September 28, 2006 – is correct, then Reed's "irrefutable evidence" letter (dated October 3, 2006) and Rice's declaration (dated September 22, 2006) would have come on the heels of this subterfuge.

The plaintiffs' response to Potrafaka's conclusion is limited to argument and speculation (they cite no evidence other than Potrafka's report itself), and the plaintiffs essentially concede that the Fharmacy Macintosh G4 was not in existence in 2001. The whole of the plaintiffs' response (mistakes included) reads as follows:

> Defendants accuse Plaintiffs of backdating the files on it G4 Apple computer with Shelton Rivers included somewhere in the file name. Defendants repeatedly reference the report of their forensic expert, Ives Potrafka, however nowhere in Mr. Potrafka's report does it state the Plaintiffs' backdated any files on their computer. Instead, the report identifies files named "shelton_rotweiler" with a creation date of 9-28-2001 and a modification date of 9/28/2001 [sic – should read 8/28/01 on both]. The report is indefinite about the date that "shelton_rotweiler" was actually copied to Plaintiffs G-4 computer [and] guesstimates that the date may have been sometime in September 2006. This is consistent with the Apple computer files infrastructure in that it maintains two dates[,] the date the file was actually created (whether or not it was created on the G4 computer or not[)] in addition to the date that the file is save to the G4 computer. Accordingly, while Mr. Allen may have been mistaken when he said that he had the same computer that Fharmacy Records had in 2001, the findings in defense counsel's expert report confirms that Plaintiff Shelton Rivers had created the song "Ess Beats" by August 28, 2001.

Pls.' Resp. to Mot. for Sanctions at 9-10.

d.  The tape recording of the conversation between Rivers and Nassar

The tape recording of the conversation between Rivers and Nassar (in which Nassar supposedly admitted that he stole the beat) presents yet another cause for concern.  Although Rivers unequivocally stated that he had the tape at home in California, it too managed to disappear.  In a letter dated August 18, 2006, Reed stated that he would forward counsel a copy of the recording "upon receipt of the tape from [Rivers]."  Defs.' Mot. for Sanctions, Ex. 19, Reed Letter (dated Aug. 18, 2006).  However, in a letter dated November 10, 2006, Reed represented that "Mr. Rivers cannot locate the tape."  Defs.' Mot. for Sanctions, Ex. 20, Reed Letter (dated Nov. 10, 2006).  The plaintiffs now downplay the importance of the recording, averring that even if Rivers had been able to find it, "it would have been inadmissible because the conversation was recorded without Mr. Nassar's knowledge and consent."  Pls.' Resp. to Mot. for Sanctions at 8 (no law cited).

e.  The assignments

Production of the original assignment agreements has raised additional concerns.  These documents were suspicious for a variety of reasons, including the fact that the first document (dated 2001) referenced entities that were not founded until 2004.  Hence, the defendants understandably sought to examine these documents to determine their authenticity, and Magistrate Judge Scheer ordered production of the same.  That never happened.

Shortly after Seaton testified that he gave the originals of both documents to Mr. Reed, Reed responded that he was unable to find the first assignment document drafted in 2001.  (He did find and forward the 2004 document.)  On August 18, 2006, Reed wrote defense counsel and stated: "Please be advised that we have researched our files, and we do not have the original [2001] agreement that Mr. Seaton refers to in your letter.  Mr. Seaton has also researched his file and has

been unable to locate the document." Defs.' Mot. for Sanctions, Ex. 21, Reed Letter (dated Aug. 18, 2006). On September 18, 2006, Reed provided defense counsel with an update: "[O]ur office does not have the original [2001] agreement that Mr. Jeff Seaton mistakenly indicated that he provided our office with. As of September 13, 2006, he indicated he checked all of his other files and was unable to locate the original. If he is able to locate the document subsequent to his letter, we will be glad to provide the document to you." Defs.' Mot. for Sanctions, Ex. 22, Reed Letter (dated Sept. 18, 2006).

Since the original never turned up, the defendants sought examination of Seaton's mother's computer, which Seaton allegedly used to draft the 2001 document. Seaton Dep. at 103. That effort was stymied as well. Prior to Judge Scheer's order on the motion to compel, Seaton submitted a declaration stating as follows:

1.      I reviewed the computer at my mother's house and it does not have the "Ess' Beats" Assignment document on the hard drive.

2.      As of this date, the Acer equipment is the only equipment located at my mother's home. All previous equipment up to the year 2001 was disposed of and discarded due to obsolescence.

Defs.' Mot. for Sanctions, Ex. 23, Seaton Dec (dated Oct. 20, 2006). Following Judge Scheer's order requiring a more complete statement, Seaton furnished a supplemental declaration:

1.      I reviewed the present computer at my mother's house on October 18, 2006 and it did not have the "Ess' Beats" Assignment document on its hard drive.

2.      That I nor my mother are currently in possession of the computer that was used to draft the transfer of "Ess Beats" assignment that refers to the various entities related to Fharmacy that were not formally incorporated but were used by Fharmacy involving various entertainment projects during the year 2001 to this date.

3. The computer equipment used during 2001 was discarded due to obsolescence. The computer was discarded for trash pick up by me at the request of my mother.

Defs.' Mot. for Sanctions, Ex. 24, Seaton Dec (dated Dec. 8, 2006).

The plaintiffs' response to the defendants' challenge to the validity of the 2001 assignment document is unsatisfying. The plaintiffs state that, "[a]lthough Fharmacy Records Production Co. and Fharm I Publishing did not formally exist at the time the assignments were signed[,] the Plaintiffs conducted business in those names at that time and consider[ed] them to exist based on that fact." Pls.' Resp. to Mot. for Sanctions at 8. However, other than Seaton's declaration, the Court has found no testimony that substantiates this assertion, even though Seaton and Allen were specifically questioned about the genesis of Fharmacy Records Production Co. and Fharm I Publishing. *See* Seaton Dep at 27-32; Allen Dep. at 51-53.

### f. The R.J. Rice declaration

Pursuant to Judge Scheer's order, the defendants also took the opportunity to depose R.J. Rice on December 4, 2006 to question him about his earlier declaration. At the deposition, defense counsel played a CD with "ESS Beats" on it, and Rice stated that he did not recognize it. Defs.' Mot. for Sanctions, Ex. 25, Rice Dep. at 22-24, 33-35. Rice stated that he knew Rivers to be a producer, having first met him in the late '90s when he came by R.J. Rice Studios to interest Rice in his beats. Even though he did not recognize "ESS Beats" when played, Rice stated that he purchased three beats from Rivers, one of which was "ESS Beats," for possible use with the recording group Slum Village. For some reason, "ESS Beats" never made it onto Slum Village's album, but another one of Rivers's beats did. Rice said that they "were going to use ["ESS Beats"] on one of Slum's future albums, but [they] never did because it was taken by . . . DMX." *Id.* at 33.

When questioned further about why he did not recognize "ESS Beats," the following exchange took place:

> Q. I'll represent to you that that is what the plaintiffs are telling us is the track called Ess Beats.
> A. Okay.
> Q. And you've never heard – you've never – you wouldn't recognize that, sitting here today, if I played that for you?
> A. No, no, I wouldn't recognize it.
> Q. Had you ever heard that before?
> A. Yeah – I don't know if I heard that before, I don't know.
> Q. But have you heard something called Ess Beats before?
> A. Yes.
> Q. But you don't know if that, what I played on the CD, was ESS Beats or not?
> A. No. I've heard thousands of tracks over the five years I've heard –

*Id.* at 34-35. Rice went on to state that he met with Rivers regarding "ESS Beats" and other songs somewhere around 2000. Rivers met with Slum Village at Rice's studio and they selected three beats to use, one of which was "ESS beats." Before Rice purchased the beats, he went to the "back room" where the equipment was and listened to each of the beats as Rivers played them through his MPC 2000. After Rice paid Rivers for the songs, Rivers loaded the beats on "[t]wo tracks from the drum machine to a computer system" at Rice's studio. *Id.* at 48. In this fashion, "ESS Beats" supposedly made it onto one of Rice's hard drives. Rice stated that he listened to "Shot Down" "years ago," shortly after it came out, but he hadn't heard it since. *Id.* at 81. According to Rice, he and Rivers own "ESS Beats," and he tends to think the Fharmacy entities have no legitimate claim to it. When presented with his earlier declaration (which is in some tension with the fact that he did not recognize "ESS Beats" when played), Rice stated that it was prepared by Gregory Reed's office, and he signed after looking it over. *See id.* at 88-90 (stating that he only "half-read it"). However, Rice never disavowed his statements in the declaration.

In response to the defendants' contention that the veracity of Rice's declaration is undermined by the fact that he did not recognize "ESS Beats" when it was played for him some three months later, the plaintiffs simply observe that "[t]he declaration does not clearly contradict Mr. Rice's testimony." Pls.' Resp. to Mot. for Sanctions at 9. Strictly speaking, this is true. However, it is unusual that Rice would swear the two songs were "identical" in September 2006, *see* Rice Dec. at ¶ 3, and then fail to recognize "ESS Beats" at his deposition in December of that year, *see* Rice Dep. at 22-23, 33-35.

R.J. Rice brought an external hard drive to the deposition with him that supposedly contained "ESS Beats" files dated from 2001. It was detained at Mr. Reed's office for a few days, after which Ives Potrafka picked it up for inspection. Analyzing this hard drive, Potrafka found that although it contained sound files corresponding to "ESS Beats" that had creation dates consistent with the plaintiffs' theory, it was impossible to verify their accuracy. Potrafka concluded:

> It is the opinion of this computer forensic examiner that the dates for the "new cuts" and "shelton_rotweiler" files found on the R.J. Rice Studios external hard drive cannot be accurately determined based on the following facts:
>
> ● The files contain the default Macintosh creation date of January 1, 1904
>
> ● Without the computer on which that files [sic] were created it is impossible to verify the creation dates.

Potrafka Report at 6. It appears that the original computer used to download the "ESS Beats" files to the Rice external hard drive no longer exists. The plaintiffs have not contradicted the defendants' assertion that the dates on the Rice hard drive cannot be verified.

D.  The musicology experts

The parties each retained experts in the field of musicology to give opinions on the similarities between the two works.  A cursory review suggests that both experts are qualified in the field and competent to opine on the similarities between "ESS Beats" and "Shot Down."  As to their conclusions, they are, in an important respect, consistent with one another.  Although the experts differ when it comes to the degree of similarity, they both conclude that there are *some* differences between the two works.  In addition, the defendants' expert suggests that there are salient differences among the various copies of "ESS Beats," confirming in some measure the defendants' suspicions about the legitimacy of the plaintiffs' sources.

The plaintiffs' expert is Judith Finell.  After listening to "ESS Beats" and "Shot Down," she concluded that

7.  "ESS [Beats]" and "Shot Down" are strikingly similar musical works.

8.  This is because they are nearly identical, both in each of their individual instrumental parts, as well as in the way these parts are simultaneously combined, for the entirety of both songs.

9.  The two songs also share several particularly distinguishing features.

10.  In comparing the instrumental material in "ESS [Beats]" and "Shot Down," the two songs sound like virtually the same recording, with a few very minor differences.

11.  It is unlikely that "Shot Down" was created independently of "ESS [Beats].

Pls.' Mot for Dismissal [dkt # 219], Ex. E, Finell Report at ¶¶ 7-11.  Finell described the differences between the two tracks, which she classified as "slight technical differences," as follows:

29.  The keyboard part would sound identical between the two songs to the average listener.  While in-depth analysis shows that there are slight technical differences between the two songs here, these differences do not detract from the overall reality of their striking similarity.
. . .

a.  In "ESS [Beats]," scale degree 1 occurs in the first, third, and fourth bars of each "loop."

b.  In "Shot Down," scale degree 1 occurs irregularly, from loop to loop.  For example, in bars 5-16 of the song (after the introductory section), scale degree 1 occurs in bars 5, 8, 12, 13, and 16.

c.  Regardless of these small technical differences, the ordinary listener would hear them as the same.

. . .

37.  In listening to "ESS [Beats]" and "Shot Down," they sound like an instrumental version and vocal version (respectively) of the same song, except for the irregularity in the keyboard melody in "Shot Down's" "loop" repetitions.

*Id.* at ¶¶ 29-30, 37.

The defendants' musicology expert, Anthony Ricigliano, found the contrasts to be more pronounced.  Moreover, Ricigliano concluded that from a musicological perspective, it is more likely that Nassar created the beat first.  Ricigliano stated his ultimate conclusion as follows:

After listening to, comparing and analyzing these compositions as well as the various compact discs containing individual instrumental tracks, I concluded that although the composition *Shot Down* and the work *Ess Beats* both contain essentially the same musical material in the accompaniment, they are overall two distinctively different recordings.  Furthermore, the musical material contained in the synthesizer parts is so distinctive in execution that the possibility of independent creation seems very remote.  Since the Shelton Rivers individual tracks are often defective, while the Nassar tracks are "clean," it is appropriate to conclude that the Nassar tracks served as the basis for creating the composition *Shot Down*.

Pls.' Mot. for Dismissal, Ex. F, Ricigliano Report at ¶ 1.  Among other things, Ricigliano noted that "Shot Down" does not contain some of the "varied instrumental patterns" that are present in "ESS Beats," *id.* at ¶ 18, which observation corresponds with Finell's assessment, *see* Finell Report at ¶¶ 29-30, 37.  And he found some further oddities.  In conducting his analysis, Ricigliano reviewed a number of recordings, including "[t]wo sound recordings titled *Ess Beats*," "[a] compact disc

-29-

containing the composition entitled *Shot Down*," and "[c]ompact discs containing individual music discs supplied by both plaintiffs and defendants." *Id.* at ¶ 1. With respect to the last group of CDs, Ricigliano reported as follows:

19. Also examined were several compact discs containing separate tracks that represent the individual instrumental tracks shown above. There are significant differences between the various versions produced by Rivers and between those versions created for *Shot Down*.

20. The plaintiffs' disc labeled *Shelton rotweiler* (from Rice and Fharmacy disc drives) contains instrumental tracks numbers #85 through #94. For example, track # 85 contains continuous repetition of the snare drum pattern and track # 88 continuous repetition of the high-hat cymbal parts . . . .

21. While track # 85 and # 92 (from Rice) are free of extraneous noises, the remainder of these tracks are not "clean," tracks # 86, #89, #90, #94 contain what appears to be "bleeding" of one track (primarily track #93) into another. That is, the unwanted musical material can be heard in the background. In addition, track #89 begins with "hum" while many of these tracks #87, #88, #89 and #90 have noises or "pops," often at the same time mark (1:39). Therefore these defective tracks undoubtedly were not used to create the accompaniment in *Shot Down*.

22. In contrast the defendant's [sic] nine tracks (labeled Nassar) are without blemish or extraneous noises and represent "clean" tracks that contain only the specific musical material designation for each track. This suggests that these tracks, rather than the individual defective tracks provided by Rivers, were used to create the recording of *Shot Down*. This conclusion appears to be supported by the other U[niveral ]M[usic ]G[roup]-produced discs reviewed that memorialize the production process of *Shot Down*.

23. Also reviewed was another compact audio disc (from Reed) with nine tracks dated August 3, 2006. These tracks differ from the *Shelton rotweiler* (Rice) tracks in several ways. First, these tracks do not have the "bleeding" present in the Rice or F[h]armacy tracks. Secondly, the Rice tracks are all over 4 minutes in length whereas the Reed tracks are approximately 14 seconds in length. Thirdly, there are two "f sample" and two "sample" tracks that are labeled L and R (for left channel and right channel), however, each channel is identical. Since these tracks are dated August 3, 2006, they may have been produced after the fact as a recreation of the *Shot Down* tracks.

*Id.* at ¶¶ 19-23.

## E. Other "expert" discovery

As mentioned earlier, Salaam Nassar stated that he played his beat for Tonytta Martinez sometime in 2000. Apparently Martinez is a former client of Gregory Reed. Reed filed an affidavit stating that he spoke to Martinez three times in December 2000 and learned that Martinez possessed a computer disc that might contain files to help establish when the beat line for the "Shot Down" creation was made. After some difficulty, Mr. Martinez turned over his laptop to Mr. Reed during a court hearing on June 27, 2007 so Reed could have his computer expert, Bernard Terry, analyze it. The plaintiffs were to arrange for a mirror image to be made (by someone other than Terry, since he is "not a computer forensic expert"), and return the lap top afterwards. Order Directing Martinez to Turn Over Comp. [dkt # 195] at 1-2. The hand-off apparently went smoothly, but it is unclear what, if any, analysis Terry performed on the materials obtained from Martinez.

The plaintiffs have offered Mr. Terry as an expert in both musicology and computer forensics, but it is doubtful that Terry is adequately qualified in either field.

To date, Terry has produced three "reports" (but none based on the Martinez materials). The first "report" consists only of a brief email message that Terry sent to Reed on December 29, 2006 following his "examination" of the zip disk that Nassar had produced. In one short paragraph, Terry stated that he was unable to determine the creation dates for the files in the zip disk. When defense counsel informed Mr. Reed that this was submission inadequate under Rule 26(a)(2), Terry, assisted by Mr. Reed, furnished a more formal document styled "Forensic Computer Expert Report" on March 21, 2007. Therein, Terry reiterated his ultimate conclusion that it was impossible to determine the creation dates for the files found on Nassar's zip disk. In addition to the conclusion,

however, Terry's second report reveals two things: (1) that Terry did not perform the operative steps of the analysis; and (2) that Terry is not qualified in computer forensics.

In describing his methodology, Terry explained that he tried to access the zip disk by using Nassar's zip drive, but the zip drive did not work. Accordingly, he took the zip disk to "a computer speciality shop" called IO Software, where technicians pulled up the files so they could be read. Defs.' Mot. to Exclude, Ex. D, Second Terry Report at 2. Although Terry states in his report that he "read the files from the zip disk" at IO Software, *ibid.*, his deposition testimony contradicts that, *see* Defs.' Mot. to Exclude, Ex. E, Terry Dep. at 40-41. It is clear from Terry's deposition that he simply stood by and watched as IO Software staff performed tests and relayed the results. *See, e.g., id.* at 41 ("They told me that the MPC that created this data did not time stamp the data . . . . That's the conclusion. That's the details that I learned from IO Software.").

Terry's purported "qualifications" are even more revealing:

**QUALIFICATION OF WITNESS:**
The forensic computer examiner has been the music production and engineering mastermind behind major label releases from Flint based artists since the late 1980's. MCA recording group Ready for the World, Top Authority, the Dayton Family, MC Breed, Mary Davis of the SOS Bank, Howard Hewitt and others, are just a sampling of the artists that the forensic computer examiner produced or engineers session for more than a quarter century. The forensic computer examiner has an intimate knowledge of recording and production equipment acquired over the past 35 years from prior work experiences.

Second Terry Report at 2 (mistakes in original). The plaintiffs have not explained how these experiences have a bearing on computer expertise.

Moreover, Mr. Terry admitted in his deposition that he was not a computer forensics expert:

Q. Okay. Have you ever called yourself in any of your professional dealings a forensic computer examiner?
A. Not – no.

Q. Have you ever been retained as a forensic computer examiner other than by Mr. Reed on this case?

A. No.

. . .

Q. Do you know whether there is any kind of college class or training class on the topic of forensic computer examination?

A. No.

Q. Have you ever attended any kind of college class or training class on the topic of forensic computer examination?

A. No.

Q. Did you know before today that Mr. Reed would in this document [i.e., Terry's "Forensic Computer Expert Report"] be referring to you as a forensic computer examiner?

A. I did not.

Q. Would you purport to hold yourself out to the Court or to others as a forensic computer examiner?

A. No.

Defs.' Mot. to Exclude, Ex. E, Terry Dep. at 63-64. Terry later confirmed that he did not prepare the report, because he does not type. Instead, Terry took some notes with a pencil and relayed his findings to Reed over the telephone. Reed then drafted the report, and read it back to Terry over the phone. It seems unlikely to the Court that Reed read the entire report to Terry, since it refers to Terry twelve times as a forensic computer expert and mistakenly refers to his studio as "Silver Star Studios." *See* Second Terry Report at 1-2; *but see* Terry Dep. at 63 (confirming that his studio is called "Silversun"). Later in the deposition, Reed made an anemic attempt to rehabilitate Terry's credibility as a forensics expert. After eliciting testimony to establish Terry's exploits as a music producer and engineer, Reed questioned Terry as follows:

Q. So would you consider yourself after going through this [i.e., a long tenure of music production] a forensic computer expert?

A. Prior to having this conversation about forensic, I honestly didn't know what forensic meant. I have clarity now and understand what the term is and yes, I do. Yes, I am.

*Id.* at 79-80.  According to Terry, he gained this "clarity" by looking up the word "forensic" in a dictionary during a break.  *Id.* at 91.

The third report submitted by Terry was offered to rebut the findings of Anthony Ricigliano, the defendants' expert musicologist.  Given the stated purpose of this report – to "assess the approach used by Mr. Ricigiliano [sic]" – it appears that Terry was holding himself out as a musicologist.  Defs.' Mot. to Exclude, Ex. F, Third Terry Report at 1.  Terry apparently believes that Ricigliano's report fails to address whether "ESS Beats" and "Shot Down" are "substantially similar," which is not useful since Ricigliano never purported to engage that issue and in fact specifically stated that he found the works substantially similar, although he found salient differences that lent themselves to the conclusion that Nassar made the beat first.  Ricigliano Report at ¶ 11.

In his deposition, Terry disqualified himself as a musicologist:

Q.  Are you familiar with what a musicologist is?
A. Yes.
Q.  What is a musicologist?
A.  It's a person that analyzes music for record companies and just provides music analyzation services.

. . .
Q.  Do you recognize musicology as an expertise like accounting or law?
A.  Sure.  Absolutely.
Q.  Would you purport to hold yourself out as a musicologist?
A.  I am not a musicologist.

Terry dep. at 70.

With Terry's credibility and qualifications impeached, Mr. Reed intervened once again in an attempt to rehabilitate Terry through submission of an additional affidavit.  In an affidavit dated August 20, 2007, Terry explains that he truly is a computer forensic expert, and his report rebutting

the findings of Mr. Ricigliano is legitimate based on Terry's knowledge of studio equipment. *See* Pls.' Resp. [dkt # 210], Ex.C, Terry Dec. at ¶¶ 1-7 (stating, *inter alia*, "I have worked with MPC 2000 sequencing and tracking machine [sic] since they were introduced to the market during the 1990s"). In an attempt to explain why he "mistakenly"confessed to not being a computer forensic expert, Terry states:

> 9. On the date of the examination, Mr. Quick asked me about the term "forensic examiner" I thought I knew what term means during the break I was puzzled by his tone and manner in how he asked me. I looked up the term in the dictionary during the break to refresh my understanding then I recognized that is what I had been doing for the past 20 years or so.
>
> 10. I was able to readdress Mr. Quick's question, and I did when Mr. Reed asked me a similar question in regards to the term "forensic."
> . . .
>
> 12. I was never coached by Mr. Reed but he reminded me I must tell the truth and stay calm.
> . . .
>
> 18. Mr. Reed's office retyped one of my reports and inserted the term and title "Forensic Computer Examiner" and read the report to me. As his office read back my report, I focused on the content, substance and text to make sure that it was not changed. I did not focus on the word "forensic" since I knew the report and the examiner was one and the same and the content was on point.

*Id.* at 9-10, 12, 18 (mistakes in original).

## II. Cross motions for summary judgment

The defendants have moved for summary judgment asserting three distinct grounds. First, they claim that the plaintiffs' copyright registration is invalid because the plaintiffs cannot state with certainty that the CD sent to the Copyright Office is virtually identical to the original, and the plaintiffs do not know when the original was created. Second, the defendants contend that the plaintiffs have produced no real evidence that Shelton Rivers is the original author of the beat line

that appears on the "Shot Down" recording, and the plaintiffs cannot prove sampling because there is no evidence that sounds on "Shot Down" are the actual sounds from Rivers's recording. Third, they argue that their own evidence of independent creation defeats the plaintiffs' infringement claim.

The plaintiffs also have moved for summary judgment on the issue of infringement, contending that their "irrefutable evidence" conclusively demonstrates that the rhythm track on "Shot Down" is "substantially similar" to ESS Beats, and Rivers was the original author of the latter. In fact, despite the clear indication that their complaint exclusively pleads a cause of action based on sampling of a sound recording – not the infringement of a musical composition copyright – the plaintiffs spend considerable effort discussing the substantial similarity test, which, as discussed below, is inapplicable to their claim.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). The parties have filed cross motions for summary judgment, which might imply that there are no facts in dispute. Nonetheless, the Court must apply the well-recognized standards when deciding such cross motions; "[t]he fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). Therefore, when this Court considers cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003).

A motion for summary judgment under Fed. R. Civ. P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences

in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005), the Sixth Circuit drew clear and explicit distinctions between musical composition copyright infringement claims and sound recording infringement claims like the one now before the Court. It found the source of those distinctions in the relevant statutes, to which this Court turns as well.

Copyright law protects an owner's rights to creative works of authorship including "sound recordings" and "musical works." 17 U.S.C. § 102(a)(2), (7). "'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. § 101. "[A] musical composition 'is a particular sequence and arrangement of lyrics and/or music that comprise what most people refer to as a "song."'" *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 475 n.3 (6th Cir. 2003).

A copyright owner has the exclusive rights to do and authorize the following:

(1) to reproduce the copyrighted work in copies or phonorecords;
(2) to prepare derivative works based upon the copyrighted work;
(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

(4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

17 U.S.C. § 106. "The exclusive rights of the owner of copyright in a sound recording are limited to the rights specified by clauses (1), (2), (3) and (6) of section 106, and do not include any right of performance under section 106(4)." 17 U.S.C. § 114(a).

The exclusive right of the owner of copyright in a sound recording under clause (1) of section 106 is limited to the right to duplicate the sound recording in the form of phonorecords or copies that directly or indirectly recapture the actual sounds fixed in the recording. The exclusive right of the owner of copyright in a sound recording under clause (2) of section 106 is limited to the right to prepare a derivative work in which the actual sounds fixed in the sound recording are rearranged, remixed, or otherwise altered in sequence or quality. The exclusive rights of the owner of copyright in a sound recording under clauses (1) and (2) of section 106 do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording.

17 U.S.C. § 114(b).

Based on those statutes, the *Dimension Films* court observed that "[s]ound recordings and their underlying musical compositions are separate works with their own distinct copyrights." *Dimension Films*, 410 F.3d at 796 n.3. It has been accepted, therefore, that "'[w]hen a copyrighted song is recorded on a phonorecord, there are two separate copyrights: one in the musical composition and the other in the sound recording.'" *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002) (quoting *T.B. Harms Co. v. Jem Records, Inc.*, 655 F. Supp. 1575, 1576 n.1 (D. N.J. 1987)). "A musical composition's copyright protects the generic sound that would

-38-

necessarily result from any performance of the piece . . . [while] the sound recording is the sound produced by the performer's rendition of the musical work." *Id.* at 1249-50 (citing Nimmer on Copyright § 2.10). "[A] sound recording owner has the exclusive right to 'sample' his own recording." *Dimension Films*, 410 F.3d at 801.

The protection afforded sound recordings in a digital sampling case such as the one now before the Court, therefore, does not extend to the "generic sound"; it only protects the recorded sound – the stored electronic data digitally preserved by the composer. The substantial similarity test thus has no place in determining whether infringement occurred. As the Sixth Circuit explained, "'[i]n most copyright actions, the issue is whether the infringing work is substantially similar to the original work. . . . The scope of inquiry is much narrower when the work in question is a sound recording. The only issue is whether the actual sound recording has been used without authorization. Substantial similarity is not an issue.'" *Dimension Films*, 410 F.3d at 798 n.6 (quoting Bradley C. Rosen, Esq., 22 CAUSES OF ACTION § 12 (2d ed. 2003)).

> "Section 114(b) makes it clear that the digital sampling of a copyrighted sound recording must typically be licensed to avoid an infringement. . . . The import of this language is that it does not matter how much a digital sampler alters the actual sounds or whether the ordinary lay observer can or cannot recognize the song or the artist's performance of it. Since the exclusive right encompasses rearranging, remixing, or otherwise altering the actual sounds, the statute by its own terms precludes the use of a substantial similarity test."

*Id.* at 801 n.10 (quoting Susan J. Latham, *Newton v. Diamond: Measuring the Legitimacy of Unauthorized Compositional Sampling – A Clue Illuminated and Obscured*, 26 Hastings Comm. & Ent. L.J. 119, 125 (2003)) (internal quotes omitted).

Applying the proper test, it is quite clear from the record that the defendants are entitled to judgment as a matter of law. In their complaint, the plaintiffs leave no doubt that their claim is for

unauthorized sampling of a digital sound recording. *See* Compl. [dkt # 1] at ¶¶ 6-10, 24-25, 30, 32-33. For instance, the heart of the copyright claim reads:

> 24. Plaintiffs are informed and believe and therefore allege that Defendant DMX is a rap artist whose unauthorized use of the musical composition "ESS Beats" was sampled and incorporated on the Defendants' track and appears on DMX's "Shot Down feat. 50 Cent and Styles," recording.

> 25. That Defendants' unauthorized sampling of the song "ESS Beats" has infringed upon the rights of Plaintiffs under the Copyright Act.

*Id.* at ¶¶ 24-25 (mistakes in original). In a sampling claim, "'[t]he exclusive rights of the owner of a copyright in a sound recording . . . do not extend to the making or duplication of another sound recording that consists entirely of an independent fixation of other sounds, even though sounds imitate or simulate those in the copyrighted sound recording." *Dimension Films*, 410 F.3d at 799-800 (quoting 17 U.S.C. § 114(b)).

A reasonable jury in this case could not conclude that the defendants actually sampled "ESS Beats." Although he equivocated on the issue, even Rivers himself testified that he thinks his version of the beat "sounds better . . . than what [Nassar] did with it." Rivers Dep. at 67. Moreover, both the plaintiffs' and the defendants' expert opined that, although substantially similar, the two songs contain differences. Judith Finell, the plaintiffs' expert, stated that "the two songs sound like virtually the same recording, *with a few very minor differences*." Finell Report at ¶ 10 (emphasis added). Anthony Ricigliano, the defendants' expert, found "significant differences between the various versions produced by Rivers and between those versions created for *Shot Down*" and concluded that Rivers's tracks "undoubtedly were not used to create the accompaniment in *Shot Down*." Ricigliano Report at ¶¶ 19, 21. Of course, if those differences resulted from electronically manipulating the recorded sample, such as by changing the pitch of the actual recording or "looping"

samples of it, *see Dimension Films*, 410 F.3d at 796, the plaintiffs' claim might survive.  But there is no evidence that any of that was attempted or accomplished by the defendants here.  Because of the differences between the track submitted by the plaintiffs and the rhythm line recorded in "Shot Down," as confirmed by experts on both sides, the plaintiffs have failed to offer proof that Rivers's sound recording was duplicated.  Simply put, the track on "shot Down" is different from "ESS Beats."  There is no genuine issue of fact with respect to the one issue that matters – "whether the actual sound recording has been used without authorization." *Id.* at 798 n.6 (internal quotes omitted).  Therefore, the defendants are entitled to summary judgment, and the plaintiffs are not.

### III.  The defendants' motion to dismiss

In their motion for sanctions, the defendants contend that the plaintiffs and their attorney have engaged in intentional misconduct and have committed a fraud upon the court by manipulating, fabricating, and destroying evidence.  The defendants insist that the Court should levy the ultimate sanction for such abuses and dismiss the case.  The Court agrees.  The conduct exhibited by the plaintiffs and their attorney is deeply disturbing and requires a sanction that incorporates punishment and deterrence in equal measures.

The plaintiffs have failed to rebut many of the factual allegations articulated by the defendants.  In fact, in response to the defendants' motion, the plaintiffs hardly attempt to challenge the allegations of misconduct, choosing instead to develop the argument that the defendants' motion is simply a "litigation tactic to avoid dealing with the issues of liability and damages."  Resp. Br. at 15.  The plaintiffs continually stress that the defendants "have been unable to produce any evidence to corroborate . . . Nassar's allegation that he created the instrumental music portion of 'Shot Down.'" *Id.* at 2.  The plaintiffs brush off most of the allegations of lost or destroyed evidence

-41-

(such as the tape-recorded conversation, Rivers's erased zip-disc, and the strange assignment documents) as immaterial to the true issues in the case and nothing more than an attempt at distraction. *See id.* at 6-11.

The defendants cite Federal Rule of Civil Procedure 37(b)(2)(C) but do not rely on it as a basis to justify the court action they seek. As the defendants rightly acknowledge, the authority to dismiss an action pursuant to Rule 37(b)(2)(C) is unavailable in this case because the alleged wrongdoing does not involve violation of a court order. *See Brandt v. Vulcan, Inc.*, 30 F.3d 752, 756 (7th Cir. 1994) ("The rule's plan language limits its applicability to situations where a court order had been violated. Moreover, the case law reveals that Rule 37(b)(2) has been invoked only against parties who have disobeyed a discovery ruling of some sort."); *accord* Moore's Fed. Practice 3d § 37.40. However, "the inherent authority of the Court is an independent basis for sanctioning bad faith conduct in litigation." *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 511 (6th Cir. 2002). This does not mean that a court should exercise its inherent authority lightly, but it does mean that there is a time and place for invoking this power. As the Supreme Court has stated in the context of attorney's fees, inherent authority is not displaced merely because positive law exists on the issue:

> There is, therefore, nothing in the other sanctioning mechanisms or prior cases interpreting them that warrants a conclusion that a federal court may not, as a matter of law, resort to its inherent power to impose attorney's fees as a sanction for bad-faith conduct. This is plainly the case where the conduct at issue is not covered by one of the other sanctioning provisions. But neither is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules. A court must, of course, exercise caution in invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees. Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed

> discretion of the court, neither the statute nor the Rules are up to the task, the court
> may safely rely on its inherent power.

*Chambers v. Nasco, Inc.*, 501 U.S. 32, 50 (1991) (internal citation omitted). In *Chambers*, the

Supreme Court enumerated a number of acts that lie within a court's inherent authority. *Id.* at 43.

Among these is the power "to fashion an appropriate sanction for conduct which abuses the judicial

process . . . [including] dismissal of a lawsuit." *Ibid.*; *see also Bank of Merietta*, 307 F.3d at 512.

Notwithstanding that Rule 37(b)(2)(C) is not controlling when a court relies on its inherent

authority, courts have held that the factors pertinent to that Rule are instructive in analyzing the

propriety of dismissal pursuant to inherent authority. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958

(9th Cir. 2006). Under Rule 37(b)(2)(C), dismissal as a sanction is assessed in light of the four

factors identified by the Sixth Circuit in *Regional Refuse Sys. v. Inland Reclamation Co.*, 842 F.2d

150, 154 (6th Cir. 1988), which were succinctly summarized by the court in *United States v. Reyes*,

307 F.3d 451 (6th Cir. 2002), as follows: "(1) whether the party's failure is due to willfulness, bad

faith, or fault; (2) whether the adversary was prejudiced by the [disobedient] party's conduct; (3)

whether the [disobedient] party was warned that failure to cooperate could lead to dismissal; and (4)

whether less drastic sanctions were imposed or considered before[hand]." *Id.* at 458 (internal quotes

omitted). In any event, "[d]ismissal of an action . . . is a sanction of last resort," *Regional Refuse*,

842 F.2d at 154, and due process appears to require a finding of bad faith or willfulness, *see ibid.*;

*see also Chambers*, 501 U.S. at 50.

It must be emphasized that this is not a case involving mere gamesmanship or garden variety

discovery abuses. The actions of the plaintiffs and their attorney in this case are so egregious that

they have forfeited their right to proceed in court. The plaintiffs clearly have no respect for the civil

justice system, and it would be unfair to require the defendants to defend this case any further.

Looking to *Regional Refuse* and progeny for guidance, the first factor is whether the misconduct by the plaintiffs and their counsel results from "willfulness, bad faith, or fault." *Reyes*, 307 F.3d at 458. In the present case, this factor is plainly satisfied. Although some of the events in this litigation might be excused as resulting from mere negligence when viewed in isolation (e.g., Mr. Reed's loss of the CD allegedly furnished by Seaton), considering them in the aggregate invariably leads to the conclusion that the plaintiffs and their attorney have conducted a campaign of fraud. The list of abuses is extensive. In addition to Mr. Reed's loss of the "original" CD furnished by Seaton, Rivers's zip disk was intentionally wiped of data; Rivers lost the tape recording allegedly containing Nassar's confession; the Fharmacy computer that was allegedly used in 2001 did not even exist until 2003; that computer contained files that were intentionally backdated; the 2001 assignment document referenced entities that were not even formed until 2004; the original assignment documents were lost; the computer that was used to draft such documents was thrown away; and the R.J. Rice hard drive contained file dates that could not be verified. And this list does not even include the material inconsistencies in the plaintiffs' testimony, late disclosure of evidence, misrepresentation of evidence, and prevarications by Mr. Reed in his representations to opposing counsel. If this is not bad-faith litigation, nothing is.

The second factor is whether the defendants have been prejudiced by the plaintiffs' misconduct, *Reyes*, 307 F.3d at 458, and that element too has been satisfied. The plaintiffs seem to think that dismissal would just be a windfall to the defendants because they have come forward with relatively little evidence in support of their version of events. However, the plaintiffs forget that the burden of proof lies with them, and the defendants have a right to test the evidence brought against them. Due to the conduct of the plaintiffs and their attorney, the defendants' right to rebut the

plaintiffs' allegations has meant little because the evidence has either been lost, tampered with, or irretrievably compromised. There is simply no way that this case can go forward.

The third factor under *Regional Refuse* is whether the plaintiffs were "warned that failure to cooperate could lead to dismissal." *Reyes*, 307 F.3d at 458. This is the one factor that does not clearly militate in favor of dismissal but, on balance, it is not dispositive. There is nothing in the record showing that the plaintiffs were warned by a judicial officer that dismissal was a possibility. However, this factor seems less relevant in a case such as this, where the conduct at issue is not merely contestable, but in contravention of basic notions of fairness and professional responsibility. A party does not need formal notice to know that spoliation of evidence and misrepresentations may lead to dismissal.

The fourth and final factor is whether less drastic sanctions were imposed or considered before resorting to dismissal. *Reyes*, 307 F.3d at 458. This factor reflects the concept that dismissal is a sanction of last resort and should be issued only in extreme situations. *See Regional Refuse*, 842 F.2d at 154. This factor also favors dismissal of the instant case because lesser sanctions were imposed for earlier discovery violations, *see* Order Granting Mot. for Partial Dismissal and Sanctions [dkt # 55], and anything less than dismissal would be futile. That is, the evidence in this case has been so tainted that pushing onward to a decision on the merits (save granting summary judgment in favor of the defendants, as explained above) would be practically impossible.

For these reasons, the Court will grant the defendants' motion for dismissal pursuant to its inherent authority.

IV.  Motions challenging experts

Each side has filed a motion challenging the other side's expert witness.  The defendants argue that Bernard Terry is not qualified to offer opinions as a computer forensic expert or a musicologist.  In light of the Court's rulings on the dispositive motions, the defendants' expert witness motion is moot.

The plaintiffs have filed their own motion to exclude the testimony of defense expert Ives R. Potrafka on the grounds that he is not qualified as an expert in the relevant field and his opinions are unreliable.  The details of the plaintiff's argument are not altogether clear, but the Court draws the following argument from the plaintiffs' submissions: The plaintiffs believe that Potrafka is not qualified because he had to rely on the assistance of James Rice II in order to examine the hard drive.  That need, according to the plaintiffs, evidences Potrafka's inability to analyze hard drives in general and unfamiliarity with Logic Software in particular.  Since Potrafka relied on Rice, the plaintiffs contend that Potrofka's report is "not reliable without the support of . . . Rice." [cite] at 7. Because Potrafka cannot describe or understand the methodology used by Rice, and because Potrafka's opinion relies so heavily on Rice's work, the plaintiffs believe it is rendered unreliable.

The plaintiffs' motion has no merit.  It is no more than a vexatious response to the defendants' motion, as evidenced by the fact that it is mostly plagiarized from the defendants' motion, it was not filed until seven months after Mr. Potrafka submitted his report, and the predicate facts do not support the plaintiffs' theory.  (This tit-for-tat approach also cropped up in the plaintiffs' recently-filed motion for sanctions, which the Court will deny for want of merit as well.)  Mr. Potrafka stated in his report that five hard drives were produced by R.J. Rice Studios.  Rather than search through all those files, Potrafka met with Mr. Rice so that Rice could identify the original

files containing "ESS Beats." None of the files apparently contained identification suggesting their content. It was sensible for Potrafka to seek Rice's assistance in narrowing the scope of his search. This request does not suggest a lack of qualification on Potrafka part. Therefore, the plaintiffs' motion to exclude Mr. Potrafka's testimony will be denied.

## V.  Conclusion

The Court finds that the plaintiffs' complaint fails on the merits as a matter of law. Moreover, the conduct of the plaintiffs and their attorney has been so egregiously improper and abusive that the ultimate sanction of dismissal is the only appropriate response. Other pending motions will be dismissed as well.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt #206] is **GRANTED**.

It is further **ORDERED** that the defendants' motion to dismiss as a sanction for discovery abuses [dkt # 185, 186] is **GRANTED**.

It is further **ORDERED** that the plaintiffs' motion and amended motion for summary judgment [dkt #160, 205] is **DENIED**.

It is further **ORDERED** that the defendants' motion to exclude Bernard Terry from testifying as an expert witness [dkt #204] is **DENIED as moot**.

It is further **ORDERED** that the plaintiffs' motion to exclude Ives R. Potrafka from testifying as an expert witness [dkt #211] is **DENIED**.

It is further **ORDERED** that the plaintiffs' motion to compel payment of expert witness fees for witness Bernard Terry [dkt #222] is **DENIED**.

It is further **ORDERED** that the plaintiffs' motion for sanctions [dkt # 241] is **DENIED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  March 31, 2008

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 31, 2008.

s/Felicia M. Moses
FELICIA M. MOSES